*********** *Page 2 
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Commission, and in accordance with the directives of the North Carolina Supreme Court. The 13 August 2004 Opinion of the Supreme Court provided in pertinent part: "We reverse the decision of the Court of Appeals and remand this case to that court for further remand to the Industrial Commission with directions to make additional specific findings of fact." In light of the directives of the Supreme Court, the Full Commission has reconsidered the evidence of record and hereby enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and are subject to and bound by the provisions of the North Carolina Workers Compensation Act.
2. An employment relationship existed between plaintiff-employee and defendant-employer on 24 October 1996.
3. Casualty Reciprocal Exchange is the carrier at risk [now replaced by the North Carolina Guarantee Association].
4. Plaintiff's average weekly wage on 24 October 1996 was $515.81, yielding a compensation rate of $343.89 per week.
5. Defendant's initially issued compensation benefits pursuant to a Form 63 dated 23 December 1996 and did not thereafter deny the claim within the statutory period provided by N.C. Gen. Stat. § 97-18. *Page 3 
6. Defendants paid plaintiff temporary total disability from 9 December 1996 through 22 December 1996 and from 16 January 1997 and continuing. Defendants paid plaintiff temporary partial disability from 23 December through 15 January 1997.
7. The Commission takes Judicial Notice of the Order by Deputy Commissioner Doug Berger filed 17 August 1998; and the Administrative Decision and Order by Special Deputy Commissioner Ronnie Rowell filed 15 February 1999.
8. Plaintiff's medicals and rehabilitative notes are admitted into evidence as Stipulated Exhibit #2.
9. The following Industrial Commission Forms are admitted into evidence: Form 19, Form 63, Form 28T, Form 18, Form 28, Form 62, Form 33 dated 5 March 1999, Form 24 dated 10 December 1998, Form 24 dated 22 February 1999, Form 33 dated 10 March 1999 and Form 33R.
10. The issues to be determined by this hearing are whether plaintiff's benefits should be suspended, are defendants entitled to any credit, what is the extent of plaintiff's disability and who is the treating physician.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. On 24 October 1996 plaintiff was a 45 years old and employed by defendant-employer as a mechanic. Plaintiff was employed in this capacity approximately twenty-five (25) years. *Page 4 
2. On 24 October 1996 plaintiff sustained an injury arising out of his employment when he used an iron pry bar to replace a lower ball joint. The pry bar suddenly gave way and plaintiff felt pain in his lower back. The injury was deemed compensable when defendants failed to accept or deny the claim within the statutory time period after filing an Industrial Commission Form 63.
3. Plaintiff continued working and did not seek medical treatment until he saw Dr. Bernard Bennett with Raleigh Associated Medical Specialists on 27 November 1996. Plaintiff's complaints to Dr. Bennett focused on pain on the left side and cramps to the shoulders. Plaintiff indicated these symptoms for approximately one month after lifting a heavy object.
4. Plaintiff came under Dr. Adomonis's care, also with Raleigh Association Medical Specialist, Inc., in 1996. Dr. Adomonis prescribed physical therapy and placed plaintiff out of work. Plaintiff received temporary total disability from 9 December 1996 through 23 December 1996, and he received temporary partial disability from 23 December 1996 through 15 January 1997. On 16 January 1997 defendant began payment of temporary total disability to plaintiff again and plaintiff has received this compensation continuously through the present.
5. Plaintiff eventually came under Dr. Gwinn's care in March 1997. Dr. Gwinn is an expert in physical medicine and rehabilitation and board certified in this field. MRI's and further testing revealed plaintiff suffered from multi-level lumbar degenerative disk disease with some aggravation of his condition based on subjective physical complaints. Plaintiff has some mild lateral foraminal stenosis at L4 and L5, a slight bulge at L5 and to a lesser extent at the two levels above that. These bulges do not cause any significant narrowing of the nerve canal and there is no impingement on the nerves. *Page 5 
6. EMG and nerve conduction studies were normal. A 2 July 1997 FCE indicated plaintiff capable of working at the light to medium physical demand level for an eight (8) hour day. A work-conditioning program was recommended. Dr. Gwinn gave plaintiff permanent restrictions to avoid frequent bending and twisting at the waist, no pulling over 35 lbs or pushing over 45 lbs. Plaintiff was also restricted to lifting 25 lbs via leg/torso, 50 lbs shoulder lift, 45 lbs overhead lift and 35 lbs carrying. Dr. Gwinn recommended vocational rehabilitation.
7. At plaintiff's 23 April 1997 visit with Dr. Gwinn plaintiff's straight-leg raising test was negative and he complained of low back pain. Dr. Gwinn released plaintiff to light duty work with lifting limited to 15-20 lbs occasionally, change positions as needed and avoid frequent bending and twisting. Defendant-employer did not have work available within those restrictions.
8. Ronald Alford, a Certified Rehabilitation Counselor with Southern Rehabilitation Network, Inc. was assigned in August 1997 to assist plaintiff in finding suitable employment. The dominant goal of Mr. Alford was to return plaintiff to suitable work within his restrictions but at times plaintiff's medical issues would predominate over vocational issues and efforts were suspended.
9. Mr. Alford set up various interviews for plaintiff, which plaintiff either did not keep claiming he was in such severe pain, or attended the interview but essentially sabotaged it due to his extreme pain behavior. Specifically, Mr. Alford set up an interview with plaintiff at Capital Vacuum on 28 August 1997. Plaintiff failed to show and informed Mr. Alford that Dr. Dhillon had placed him out of work. Dr. Dhillon was not plaintiff's treating physician. Dr. Gwinn subsequently changed some of the medications Dr. Dhillon prescribed due to their habit-forming nature. The job at Capitol Vacuum was within plaintiff's restrictions; however the job was never offered since plaintiff failed to attend the interview. *Page 6 
10. In September 1997 Mr.Alford set up an interview for plaintiff with Firetrol. Mr. Alford accompanied plaintiff to the interview. During the interview plaintiff exhibited extreme pain behavior including facial expressions and grimaces and gasping for breath. This position entailed lifting no greater than 10 lbs and would allow plaintiff to sit and stand as needed. However, this job was not offered to plaintiff after his statement that he couldn't work because he was in too much pain.
11. In November 1997 Mr. Alford found a gatekeeper type position available. These duties included checking the badges of people entering the property and would allow the plaintiff to sit, stand or walk as needed. Plaintiff presented for this interview with facial grimaces, limping, and body cocked to one side, holding his back, standing and complaining of extreme pain and shortness of breath. Plaintiff appeared so sick the interviewer thought he should seek medical help immediately. Not surprisingly, plaintiff was not offered this position.
12. In December 1997 Mr. Alford found an available sales position at John West Auto Service, which fit within plaintiff's restrictions. This position involved selling auto parts and delivery of small parts. The plaintiff had expressed an interest in a field of work similar to his prior experience as an auto mechanic. However, plaintiff did not attend the interview and informed Mr. Alford later that he was in too much pain.
13. Also in December 1997 plaintiff found a job lead on his own with Revels Tractor, but he declined the interview claiming he was in too much pain.
14. Plaintiff was treating with Dr. Gwinn during the fall and winter of 1997. Although plaintiff complained of increased pain including numbness and tingling in hands and feet and pain down both legs, there was no legitimate objective basis to explain plaintiff's complaints of severe pain. Dr. Gwinn still maintained plaintiff was capable of employment. *Page 7 
15. In late December 1997 and early 1998 vocational services for plaintiff were discontinued in order to get additional diagnostic tests for plaintiff. Plaintiff continued to complain of excessive pain that was not supported by objective test results.
16. Plaintiff had seen Dr. Charron with Dhillon Orthopedic in October 1997. Mr. Alford arranged for plaintiff to receive additional diagnostic studies from Dr. Charron. A bone marrow abnormality was found on plaintiff's 23 September 1997 MRI, but subsequent testing in January 1998, including a bone biopsy, did not reveal any pathologic changes.
17. At the 3 February 1998 examination by Dr. Gwinn, plaintiff's chronic back pain complaints were out of proportion to the objective medical findings, including negative straight-leg raising and no evidence of neurological deficit. Dr. Gwinn recommended pool exercises for physical therapy. Pool therapy was ended a couple of months later because of plaintiff's severe pain complaints.
18. Dr. Chartier with Spectrum Physical Medicine conducted a biofeedback and psychological assessment. Although plaintiff was able to achieve a good level of relaxation there was no decrease in plaintiff's complaints of pain. Dr. Chartier did not recommend continuing biofeedback because of plaintiff's general inability to comply with the therapeutic process. Dr. Chartier recommended an in-house program that could address psychological elements as well.
19. At the May 1998 visit with Dr. Gwinn, plaintiff exhibited a great deal of pain behavior, moaning and groaning as he moved. Upon testing plaintiff had positive Waddell's symptoms. Plaintiff's counsel's paralegal accompanied plaintiff to Dr. Gwinn's office. Dr. Gwinn noted plaintiff's "symptoms continue to be out of proportion to the objective medical findings." Dr. Gwinn also noted plaintiff's diagnosis of multi-level degenerative disk disease predates his injury at defendant-employer. At the end of the visit the paralegal informed Dr. Gwinn that he *Page 8 
could not send reports to anyone else or have further correspondence with anyone but plaintiff's counsel. Although plaintiff himself did not object to an in-house pain management program, the paralegal informed Dr. Gwinn plaintiff would not participate because plaintiff's wife had suffered a stroke and he was her primary caregiver. The paralegal also informed Dr. Gwinn no one else could be present in the room while examining plaintiff.
20. After the 1 May 1998 visit Dr. Gwinn suggested plaintiff's care be transferred to another physician because he could not continue to treat plaintiff due to plaintiff's counsel's involvement.
21. In late May plaintiff's counsel informed Mr. Alford an in-house treatment program was not an option due to plaintiff's wife's condition. Mr. Alford had made an arrangement for plaintiff to attend an in-house treatment program in Charlotte.
22. On 17 August 1998 Deputy Commissioner Doug Berger filed an Order that "defendants shall provide and plaintiff shall accept treatment for his injury as is reasonably necessary to effect a cure, give relief or lessen the period of plaintiff's disability. Said treatment is to be rendered within a 50-mile radius of plaintiff's residence. Plaintiff is hereby ordered to cooperate with efforts at rehabilitation including medical care." Plaintiff had requested the Commission order Dr. Charles Cook, an internal medicine physician, as the treating physician. Deputy Commissioner Berger did not do so.
23. Defendants accommodated plaintiff's counsel's specific request to see Dr. William Lestini for an IME. Dr. Lestini examined plaintiff on 6 October 1998. At that visit plaintiff exhibited 5 out of 5 Waddell's signs. Dr. Lestini did not recommend surgery. Plaintiff has some disc bulges in the lumbar region but these do not cause any nerve impingement. Dr. Lestini *Page 9 
recommended plaintiff seek treatment with Dr. Carone, who is a psychiatrist specializing in back cases. Plaintiff rejected this suggestion.
24. In June 1998 plaintiff's counsel withdrew permission from Mr. Alford to meet with plaintiff alone and also indicated Mr. Alford was not to directly contact the plaintiff without written permission from plaintiff's counsel. Mr. Alford had sent plaintiff a letter and copied plaintiff's counsel. This new arrangement interfered and impeded Mr. Alford in his vocational efforts.
25. In late 1998 and 1999 plaintiff sought treatment from Dr. Charles Cook, with Raleigh Associated Medical Specialists. Dr. Cook is a specialist in internal medicine with a subspecialty in kidney diseases. Dr. Cook prescribed medication and noted that plaintiff's complaints of pain increased during treatment, even to the extent that breathing was causing him pain. Plaintiff's last treatment of record was June 1999.
26. In December 1998 plaintiff's counsel informed Mr. Alford by letter that plaintiff was not able to drive greater than seven miles to and from appointments, and that plaintiff took medication that also prevented him from driving. Plaintiff's counsel further informed Mr. Alford that a driver must be provided for plaintiff.
27. No physician had restricted plaintiff to seven miles of driving, and Dr. Gwinn had earlier informed plaintiff not to take any particular medication which made him drowsy while driving. Furthermore plaintiff had indicated in May 1998 that the reason he could not participate in an in-house treatment program was his wife had suffered a debilitating stroke. As his wife's primary caregiver, plaintiff transported her to biweekly therapy and physician appointments and took care of her daily needs. *Page 10 
28. In late 1998 and early 1999 Mr. Alford suggested Johnston County Industries for plaintiff. This program would have allowed plaintiff to participate in vocational training in an accommodated setting. Plaintiff would be able to work part-time if needed and could sit, stand, walk or lay down as needed. The work itself was rated light sedentary to light work and included packaging and assembling. The second part of the program is called America Works. This program transitions a person from Johnston County Industries into a permanent suitable job. Mr. Alford registered plaintiff for the program to begin 9 February 1999 and the defendants paid the fee. However right before he was to start, plaintiff informed Mr. Alford he would not participate in the program. The defendants lost the money they had paid for plaintiff's participation.
29. The plaintiff failed to cooperate with vocational rehabilitative efforts in February 1999 when he refused to participate in Johnston County Industries without reasonable excuse. Plaintiff would have been paid by the hour for the hours worked and work he was capable of doing. If necessary, Johnston County Industries would have provided transportation for plaintiff. Plaintiff violated Deputy Commissioner Doug Berger's 17 August 1998 Order that plaintiff cooperate when he refused to even attempt the program. This program would have been beneficial for the plaintiff.
30. Mr. Alford tesitified, and the Full Commission finds, that had plaintiff put forth a diligent effort to find work within his physical and vocational limitations, there was a reasonable likelihood that he would have succeeded in doing so.
31. Plaintiff is in need of a treating physician. The defendants have suggested Dr. Lestini but Dr. Lestini suggested Dr. Carone since Dr. Carone is a psychologist who specializes in back cases. Plaintiff would benefit from Dr. Carone's treatment. *Page 11 
32. The Full Commission places greater weight in the testimony of Dr. Gwinn, Dr. Lestini and Mr. Alford than that of Dr. Cook and the plaintiff. The Deputy Commissioner observed plaintiff's excessive pain expressions as documented by his physicians and potential employers. These expressions are out-of-line with the diagnosis and appeared to be made primarily for dramatic effect. When plaintiff did not realize he was being closely observed, such as entering and exiting the Hearing Room, plaintiff did not moan and groan, but moved freely without facial expressions of pain. As soon as plaintiff did realize he was being watched his behavior shifted completely to grimace and moan.
33. Because the Full Commission finds that plaintiff's complaints were not credible and because Dr. Cook relied on plaintiff's complaints in arriving at the opinions he expressed during the course of his testimony, the Full Commission places greater weight in the testimony of Dr. Gwinn, Dr. Lestini and Mr. Alford, because of their reliance upon objective findings, than the testimony of Dr. Cook and plaintiff.
34. Plaintiff has not only impeded defendants vocational efforts by his own unreasonable refusal to participate in the Johnston County Program and by his over-emphasizing his expressions of pain, but plaintiff's former counsel likewise impeded these efforts by placing additional restrictions on transportation and access of plaintiff, which are not based on legitimate physician's restrictions.
35. The greater weight of the medical evidence is that plaintiff is not permanently and totally disabled. Plaintiff is able to work within the restrictions provided by Dr. Gwinn. Based on the totality of the evidence of record, the Full Commission finds that plaintiff made reasonable, though unsuccessful, efforts to find employment during the period beginning with his release to return to work by Dr. Gwinn on 23 April 1997 through 9 February 1999, when he unjustifiably *Page 12 
refused to cooperate with vocational rehabilitative efforts by refusing to participate in the Johnston County Industries program. Thus, plaintiff has shown that he was disabled through 9 February 1999.
36. Plaintiff is in need of further treatment of his degenerative back condition.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order to meet the burden of proving continuing disability, plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is *Page 13 
capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v. Perdue Farms, Inc.,supra.
2. In the present case, plaintiff has shown through the production of medical evidence that he was disabled through 23 April 1997, satisfying the first prong of Russell. After that time, plaintiff satisfies the second prong of Russell by showing that he was capable of some work but, after a reasonable effort, was unsuccessful in his efforts to obtain employment until 9 February 1999, when he unjustifiably refused to cooperate with defendants' vocational rehabilitative efforts. Id.; and N.C. Gen Stat. §§ 97-2(9), 97-32. As a result of plaintiff's refusal to cooperate, defendants are entitled to suspend payment of compensation to plaintiff effective 9 February 1999. N.C. Gen. Stat. § 97-25; and Sanhoueza v. Liberty Steel Erectorsand Michigan Mutual Insurance Company,122 N.C. App. 603, 471 S. E. 2d 92 (1996).
3. To the extent plaintiff received payment of compensation for disability on or after 9 February 2009, defendants overpaid plaintiff and are entitled to take credit for or offset of said overpayment from any further compensation due plaintiff. N.C. Gen. Stat. § 97-42.
4. Plaintiff's claim for permanent and total disability compensation is denied.
5. Plaintiff is entitled to have defendants provide all medical treatment arising from the 24 October 1996 compensable injury to the extent it tends to effect a cure, give relief or lessen plaintiff's disability. Plaintiff is in need of continued medical treatment; Dr. Carone is hereby approved as plaintiff's treating physician. N.C. Gen. Stat. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD *Page 14 
1. Defendants are entitled to suspend payment of compensation to plaintiff effective 9 February 1999.
2. To the extent there has been an overpayment of compensation to plaintiff from 9 February 1999 to the present; defendants are entitled to a credit for said overpayment to be deducted from any subsequent award of the compensation that may be made to the plaintiff by the North Carolina Industrial Commission.
3. Plaintiff's claim for permanent and total disability is denied.
4. Defendants shall provide all medical treatment arising from the 24 October 1996 compensable injury to the extent it tends to effect a cure, give relief or lessen plaintiff's disability. Dr. Carone is hereby approved as plaintiff's treating physician.
5. Each side shall pay its own costs.
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ DANNY LEE McDONALD COMMISSIONER
 S/_____________ DIANNE C. SELLERS COMMISSIONER
 *Page 1